IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUN MICROSYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-782 (JJF) |
| | ) | |
| VERSATA ENTERPRISES, INC., | ) | JURY TRIAL DEMANDED |
| VERSATA SOFTWARE, INC., | ) | |
| VERSATA DEVELOPMENT GROUP, | ) | |
| INC., VERSATA COMPUTER INDUSTRY | ) | |
| SOLUTIONS, INC., VERSATA, INC., | ) | |
| TRIOLOGY, INC., and NEXTANCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER TO COMPLAINT AND COUNTERCLAIMS

Defendants, Versata Enterprises, Inc., Versata Software, Inc., Versata Development Group, Inc., Versata Computer Industry Solutions, Inc., Versata, Inc., Trilogy, Inc., and Nextance, Inc. (collectively "Versata"), hereby answer the Complaint of Plaintiff, Sun Microsystems, Inc.'s ("Sun"), as follows:

## THE PARTIES

1.       Versata admits, upon information and belief, that Sun is a Delaware corporation with its principal place of business in Santa Clara, California.

2.       Versata admits that Defendants, Versata Enterprises, Inc., Versata Software, Inc., Versata Development Group, Inc., Versata Computer Industry Solutions, Inc., Versata, Inc., Trilogy, Inc., and Nextance, Inc., are all corporations incorporated and existing under the laws of the State of Delaware.  Further, Versata admits that Defendants, Versata Enterprises, Inc., Versata Software, Inc., Versata Development Group, Inc., Versata Computer Industry Solutions, Inc., Versata, Inc., Trilogy, Inc., and Nextance, Inc., each have their principal place of business

in Austin, Texas.  Versata denies that there have been any acts "in connection with the

infringement of Sun's patents."  Versata is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 2 of Sun's Complaint and, on that

basis, denies them.

## JURISDICTION AND VENUE

3.      Versata admits that this Court has subject matter jurisdiction over the asserted

claims in Sun's Complaint arising under the patent laws of the United States, pursuant to 28

U.S.C. §§ 1331 and 1338(a).  Versata also admits that this Court has personal jurisdiction over

Versata.

4.      Versata admits that venue is proper in this district.

## COUNT ONE

5.      Versata admits that the title of U.S. Patent No. 6,832,223 ("the '223 patent") is

"Method and System for Facilitating Access to a Lookup Service," and that the '223 patent

indicates on its face that it issued on December 14, 2004.  Versata admits that a copy of the '223

patent is attached as Exhibit A to Sun's Complaint.  Versata denies each of the remaining

allegations in Paragraph 5 of Sun's Complaint.

6.      Versata denies the allegation of Paragraph 6 of Sun's Complaint.

7.      Versata denies the allegations of Paragraph 7 of Sun's Complaint.

8.      Versata denies the allegations of Paragraph 8 of Sun's Complaint.

9.      Versata denies the allegations of Paragraph 9 of Sun's Complaint.

## COUNT TWO

10.     Versata admits that the title of U.S. Patent No. 5,870,719 ("the '719 patent") is

"Platform-Independent, Usage-Independent, and Access-Independent Distributed Quote

Configuration System," and that the '719 patent indicates on its face that it issued on February 9, 1999.  Versata admits that a copy of the '719 patent is attached as Exhibit B to Sun's Complaint. Versata denies each of the remaining allegations of Paragraph 10 of Sun's Complaint.

11.     Versata denies the allegations of Paragraph 11 of Sun's Complaint.

12.     Versata denies the allegations of Paragraph 12 of Sun's Complaint.

13.     Versata denies the allegations of Paragraph 13 of Sun's Complaint.

14.     Versata denies the allegations of Paragraph 14 of Sun's Complaint.

## COUNT THREE

15.     Versata admits that the title of U.S. Patent No. 5,963,950 ("the '950 patent") is "Method and System for Facilitating Access to Selectable Elements on a Graphical User Interface," and that the '950 patent indicates on its face that it issued on October 5, 1999. Versata admits that a copy of the '950 patent is attached as Exhibit C to Sun's Complaint. Versata denies each of the remaining allegations of Paragraph 15 of Sun's Complaint.

16.     Versata denies the allegations of Paragraph 16 of Sun's Complaint.

17.     Versata denies the allegations of Paragraph 17 of Sun's Complaint.

18.     Versata denies the allegations of Paragraph 18 of Sun's Complaint.

19.     Versata denies the allegations of Paragraph 19 of Sun's Complaint.

## COUNT FOUR

20.     Versata admits that the title of U.S. Patent No. 5,761,662 ("the '662 patent") is "Personalized Information Retrieval Using User-Defined Profile," and that the '662 patent indicates on its face that it issued on June 2, 1998.  Versata admits that a copy of the '662 patent is attached as Exhibit D to Sun's Complaint.  Versata denies each of the remaining allegations of Paragraph 20 of Sun's Complaint.

21.     Versata denies the allegations of Paragraph 21 of Sun's Complaint.

22.     Versata denies the allegations of Paragraph 22 of Sun's Complaint.

23.     Versata denies the allegations of Paragraph 23 of Sun's Complaint.

24.     Versata denies the allegations of Paragraph 24 of Sun's Complaint.

## DEFENSES

### FIRST DEFENSE (FAILURE TO STATE A CLAIM)

25.     Sun has failed, with respect to each and every count of the Complaint, to state a claim upon which relief may be granted.

### SECOND DEFENSE (NON-INFRINGEMENT)

26.     Versata has not infringed, directly or indirectly, willfully or otherwise, any valid claim of the '223 patent, the '719 patent, the '950 patent, and the '662 patent.

### THIRD DEFENSE (INVALIDITY)

27.     Versata is informed and believes and thereupon alleges that each claim of the '223 patent, the '719 patent, the '950 patent, and the '662 patent is invalid for failure to meet the conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103 and 112.

### FOURTH DEFENSE (EQUITABLE ESTOPPEL)

28.     Sun is estopped by its misleading, deceptive, and unlawful conduct from asserting that Versata's products or methods infringe any valid claim of the '223 patent, the '719 patent, the '950 patent, and the '662 patent.

### FIFTH DEFENSE (LACHES)

29.     Sun's claims are barred or limited by the doctrine of laches.

**SIXTH DEFENSE (WAIVER)**

30.     Sun has waived all rights, if any, to enforce each of the '223 patent, the '719 patent, the '950 patent, and the '662 patent against Versata's products.

**SEVENTH DEFENSE (UNCLEAN HANDS)**

31.     Sun's claims are barred by the doctrine of unclean hands, the facts and circumstances of which are generally described in Versata's counterclaims below.

**EIGHTH DEFENSE (LICENSE)**

32.     Versata and/or Versata's customer's are licensed to practice the inventions claimed in the '223 patent, the '719 patent, the '950 patent, and the '662 patent.

**NINTH DEFENSE (IMPLIED LICENSE)**

33.     Versata is informed and believes and thereupon alleges that, based upon Sun's conduct, Versata and/or Versata's customer's have an implied license to practice the claims of the '223 patent, the '719 patent, the '950 patent, and the '662 patent.

**TENTH DEFENSE (PATENT EXHAUSTION)**

34.     Versata is informed and believes and thereupon alleges that, based upon Sun's conduct, Sun cannot enforce each of the '223 patent, the '719 patent, the '950 patent, and the '662 patent against Versata's products under the doctrine of patent exhaustion.

**ELEVENTH DEFENSE (FAILURE TO MARK)**

35.     Versata is informed and believes and thereupon alleges that Sun is precluded from recovering, in whole or in part, the damages sought in Sun's Complaint, because of Sun's failure to mark and/or to require Sun's licensees to mark products that practice the '223 patent, the '719 patent, the '950 patent, and the '662 patent, as required by 35 U.S.C. § 287.

## TWELFTH DEFENSE (LIMITATION ON DAMAGES AND COSTS)

36.     Sun's claims for relief and prayer for damages and injunctions are barred in whole

or in part by operation of the applicable statutes, including but not limited to 35 U.S.C. §§ 286

and 287.  Sun's damages are further limited under 35 U.S.C. § 284, due to the fact that Sun is a

customer of Nextance and uses Nextance's products.  Sun's recovery of costs is limited under 35

U.S.C. § 288.

## THIRTEENTH DEFENSE (INEQUITABLE CONDUCT - '719 PATENT)

37.     Versata is informed and believes and thereupon alleges that the '719 patent is

unenforceable because of the inequitable conduct of the named inventors and/or those involved

in the prosecution of the '719 Application before the United States Patent and Trademark Office

("PTO").  Specifically, Versata contends that the '719 patent is unenforceable due to inequitable

conduct because, prior to the issuance of the '719 patent, the named inventors of the '719 patent,

L.M. Maritzen, Rolando D. Dimaandal, Julia Giannella, Raul Arregui, and Mark Moss, and/or

others involved in prosecuting the application leading to the '719 patent, as the employees or

agents of Sun, were aware of information material to the patentability of the claims of the '719

patent, but withheld that information from the PTO during prosecution of the '719 patent with

the intention of deceiving the PTO, and made affirmative representations to the PTO during the

prosecution of the '719 patent with the intention of deceiving the PTO, including without

limitation:  (a) failure to disclose information, publications, and press releases relating to the

availability of JAVA and byte codes to the general public more than one year prior to the

effective filing date of the '719 patent, during the prosecution of the '719 patent, each of which

is material to the patentability of the claims of the '719 patent; (b) failure to cite material patents

and prior art publications during the prosecution of the '719 patent, each of which is material to

6

the patentability of the claims of the '719 patent; and (c) misrepresentation, with the intent to deceive the PTO. The specific prior art patents, publications, and misrepresentations that form the basis of Versata's allegations are set forth below in Count six of Versata's Counterclaims, which are incorporated herein by reference.

**FOURTEENTH DEFENSE (RESERVATION OF ADDITIONAL DEFENSES)**

38.     Discovery in this case has not been completed, and Versata continues to investigate the allegations set forth in Sun's Complaint and to ascertain the full extent of Sun's claims. Versata intends to rely upon such other defenses as may become available by law, or pursuant to statute, or discovery proceedings in this case, and hereby reserves the right to amend it Answer and assert such defenses.

**COUNTERCLAIMS**

**THE PARTIES**

1.     Versata Enterprises, Inc. is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

2.     Versata Software, Inc., f/k/a Trilogy Software, Inc., is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

3.     Versata Development Group, Inc. is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

4.      Versata Computer Industry Solutions, Inc. is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

5.      Versata, Inc. is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

6.      Trilogy, Inc. is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

7.      Nextance, Inc. is a corporation incorporated and existing under the laws of the state of Delaware with its principal place of business at 6011 W. Courtyard, Austin, Texas 78730.

8.      On information and belief, Sun Microsystems, Inc. ("Sun") is a corporation existing under the laws of Delaware with a place of business at 4150 Network Circle, Santa Clara, California 95054.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Versata's antitrust and patent claims pursuant to 15 U.S.C. §§ 4, 15, and 26; 28 U.S.C. §§ 1331, 1337, 1338, 2201 and 2202. This Court has supplemental jurisdiction over Versata's state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Sun, at least because Sun filed its claim for patent infringement in this Court, in response to which these counterclaims are filed.

11.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

<u>**COUNT ONE**</u>

**DECLARATION OF NON-INFRINGEMENT, INVALIDITY, AND
UNENFORCEABILITY OF THE '223 PATENT**

12.     Versata hereby incorporates by reference Paragraphs 1–11 of the Counterclaims
as if fully set forth here.

13.     Sun alleges that it holds all right, title, and interest in and to the '223 patent.

14.     Sun has sued Versata for alleged infringement of the '223 patent.

15.     Versata has not infringed and is not infringing, either directly or indirectly by way
of inducing infringement or contributory infringement, any valid claim of the '223 patent.

16.     Each claim of the '223 patent is invalid for failure to comply with the conditions
for patentability set forth in the patent laws of the United States, including but not limited to 35
U.S.C. §§ 101, 102, 103, and/or 112.

17.     The '223 patent is unenforceable based upon, *inter alia*, equitable estoppel,
laches, waiver, unclean hands, license, implied license, patent exhaustion, failure to mark, and
violations of the antitrust and unfair competition laws.

18.     An actual controversy exists between Sun and Versata regarding whether the
claims of the '223 patent are not infringed by Versata, are invalid, and/or are unenforceable.

19.     Versata seeks a declaration that the '223 patent is not infringed by Versata, is
invalid, and/or is unenforceable.

<u>**COUNT TWO**</u>

**DECLARATION OF NON-INFRINGEMENT, INVALIDITY, AND
UNENFORCEABILITY OF THE '719 PATENT**

20.     Versata hereby incorporates by reference Paragraphs 1–11 of the Counterclaims
as if fully set forth here.

21.     Sun alleges that it holds all right, title, and interest in and to the '719 patent.

22.     Sun has sued Versata for alleged infringement of the '719 patent.

23.     Versata has not infringed and is not infringing, either directly or indirectly by way of inducing infringement or contributory infringement, any valid claim of the '719 patent.

24.     Each claim of the '719 patent is invalid for failure to comply with the conditions for patentability set forth in the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103, and/or 112.

25.     The '719 patent is unenforceable based upon, *inter alia*, equitable estoppel, laches, waiver, unclean hands, license, implied license, patent exhaustion, failure to mark, inequitable conduct, and violations of the antitrust and unfair competition laws.

26.     An actual controversy exists between Sun and Versata regarding whether the claims of the '719 patent are not infringed by Versata, are invalid, and/or are unenforceable.

27.     Versata seeks a declaration that the '719 patent is not infringed by Versata, is invalid, and/or is unenforceable.

## COUNT THREE

### DECLARATION OF NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY OF THE '950 PATENT

28.     Versata hereby incorporates by reference Paragraphs 1–11 of the Counterclaims as if fully set forth here.

29.     Sun alleges that it holds all right, title, and interest in and to the '950 patent.

30.     Sun has sued Versata for alleged infringement of the '950 patent.

31.     Versata has not infringed and is not infringing, either directly or indirectly by way of inducing infringement or contributory infringement, any valid claim of the '950 patent.

32.     Each claim of the '950 patent is invalid for failure to comply with the conditions for patentability set forth in the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103, and/or 112.

33.     The '950 patent is unenforceable based upon, *inter alia*, equitable estoppel, laches, waiver, unclean hands, license, implied license, failure to mark, and violations of the antitrust and unfair competition laws.

34.     An actual controversy exists between Sun and Versata regarding whether the claims of the '950 patent are not infringed by Versata, are invalid, and/or are unenforceable.

35.     Versata seeks a declaration that the '950 patent is not infringed by Versata, is invalid, and/or is unenforceable.

## COUNT FOUR

### DECLARATION OF NON-INFRINGEMENT, INVALIDITY, AND UNENFORCEABILITY OF THE '662 PATENT

36.     Versata hereby incorporates by reference Paragraphs 1–11 of the Counterclaims as if fully set forth here.

37.     Sun alleges that it holds all right, title, and interest in and to the '662 patent.

38.     Sun has sued Versata for alleged infringement of the '662 patent.

39.     Versata has not infringed and is not infringing, either directly or indirectly by way of inducing infringement or contributory infringement, any valid claim of the '662 patent.

40.     Each claim of the '662 patent is invalid for failure to comply with the conditions for patentability set forth in the patent laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103, and/or 112.

41.     The '662 patent is unenforceable based upon, *inter alia*, equitable estoppel, laches, waiver, unclean hands, license, implied license, failure to mark, and violations of the antitrust and unfair competition laws.

42.     An actual controversy exists between Sun and Versata regarding whether the claims of the '662 patent are not infringed by Versata, are invalid, and/or are unenforceable.

43.     Versata seeks a declaration that the '662 patent is not infringed by Versata, is invalid, and/or is unenforceable.

## COUNT FIVE

### ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2
### SHAM LITIGATION

### A.     Trilogy's Patented Product Configuration Technology

44.     One of Versata's primary product lines is its product configuration software.  This technology, as the name implies, enables a consumer to select different options on a product such as a computer or a car.  Versata's product configuration technology ensures that only the proper options are presented to the consumer so that the final product is one that can be built and sold.

45.     Versata owns three patents that relate to Versata's product configuration technology (the "Versata Patents").

46.     The first of the Versata Patents is United States Patent No. 5,515,524 ("the '524 patent"), entitled "Method and Apparatus for Configuring Systems."  The United States Patent and Trademark Office ("PTO") duly and legally issued the '524 patent on May 7, 1996.  Versata holds all right, title, and interest in and to the '524 patent.

47.     The second of the Versata Patents is United States Patent No. 5,708,798 ("the '798 patent"), entitled "Method and Apparatus for Configuring Systems."  The PTO duly and

legally issued the '798 patent on January 13, 1998.  Versata holds all right, title, and interest in

and to the '798 patent.

48.      The third of the Versata Patents is United States Patent No. 6,002,854 ("the '854

patent"), entitled "Method and Apparatus for Configuring Systems."  The PTO duly and legally

issued the '854 patent on December 14, 1999.  Versata holds all right, title, and interest in and to

the '854 patent.

        **B.**      **<u>Trilogy's License Agreement With Sun</u>**

49.      On or about November 30, 1998, Trilogy Software, Inc. ("Trilogy") (now known

as Versata Software, Inc.) and Sun executed a Software License Agreement ("License

Agreement") and a Professional Services Agreement ("Services Agreement").  Pursuant to the

License Agreement, Trilogy granted Sun a non-exclusive right and license to use its product

configuration computer software in accordance with certain specified terms and conditions.

Pursuant to the Services Agreement, Trilogy agreed to provide professional services related to its

licensed products to Sun.

50.      Trilogy establishes and memorializes a confidential relationship with each of its

customers, and Sun was no exception.  Section 1.2 of the License Agreement and Section 4.1 of

the Services Agreement each defined "Confidential Information" as:

> Any and all information disclosed by a party hereunder ("Discloser") to the other
> ("Recipient") in a written or other tangible form and which is clearly marked as
> being confidential or proprietary.  Information disclosed orally shall also
> constitute "Confidential Information" if it is (a) designated as confidential or
> proprietary by the Discloser at the time of disclosure, and (b) summarized and
> identified as being Confidential Information in a writing which is received by
> Recipient within thirty (30) days after disclosure.

51.      Section 9.2 of the License Agreement and Sections 4.2 and 4.5 of the Services

Agreement provided in part that:

Recipient shall neither disclose Discloser's Confidential Information to any third party, nor use the same for any purpose other than as set forth in this Agreement. In the case of Sun, it may use Confidential Information of Trilogy only to support its use of the Licensed Product(s) as expressly authorized by this Agreement. Recipient shall use the same degree of reasonable care as it uses to protect its own confidential information, but no less than reasonable care, to prevent the unauthorized use, dissemination or publication of the Confidential Information. Recipient shall not, in whole or in part, copy or reproduce the Confidential Information except as necessary for the purposes expressly set forth in this Agreement.

\*   \*   \*

Notwithstanding the definition of "Confidential Information," . . . (iii) "Confidential Information" of Trilogy includes (A) all information or materials generated by Sun that contains or reflects Confidential Information of Trilogy, (B) the Software Tools; and (C) any source code of Trilogy (including source code for the Computer Industry Model (CIM)).

52.   Additionally, Amendment No. 1 to the License Agreement provided that:

Trilogy's highly confidential and proprietary Computer Industry Model ("CIM") is a compilation of configuration modeling language code ("CML") and data that models generic product logic (including hardware and software configuration logic) and generic product data for certain data processing products.  The CIM includes object code and source code forms.  The CIM and nonpublic information relating thereto is Trilogy Confidential Information.  CML modeling techniques and nonpublic information related to CML are also Trilogy Confidential Information.

53.   In two addenda to the Services Agreement, the parties also agreed that Trilogy's

Confidential Information would include Trilogy's Source Safe database and Trilogy's Silk

Framework Development Kit.

54.   After the parties entered into the License Agreement and Services Agreement

(collectively, "Agreements"), Trilogy deployed its product configuration software at Sun.

During the course of that deployment and Trilogy's subsequent business dealings with Sun, Sun

gained access to and acquired valuable technical and commercial trade secrets and confidential

and proprietary information belonging to Trilogy.

14

55.     Pursuant to the Agreements, Trilogy employees and contractors trained Sun employees to use Trilogy's product configuration software.  The Sun employees trained on Trilogy's configuration software included, but were not necessarily limited to, Ateet Goel, Rupa Krishnan, Andrew Magyar, Ranju Rajan, and Manav Sharma.  These Sun employees gained access to and acquired valuable Trilogy trade secrets and confidential and proprietary information as part of the training process.

### C.     Sun's W5C Configurator

56.     In 2002, Sun issued a Request for Proposal ("RFP") soliciting a new vendor to provide its product configuration software.  Although Trilogy submitted a proposal to Sun in response to the RFP, Sun did not select Trilogy as its configuration software vendor going forward.  Rather, during the summer of 2002, Sun selected Oracle Corporation ("Oracle") as its new vendor for product configuration software.

57.     Upon information and belief, after selecting Oracle as its new vendor for product configuration software, Sun began to develop its own internal configuration solution.  In August 2002, Sun transitioned nearly all of the Sun employees assigned to work with the Trilogy Configurator in use at Sun (including, but not necessarily limited to Ateet Goel, Rupa Krishnan, Andrew Magyar, Ranju Rajan, Manav Sharma, and Shyam Lakshman) to its internal "W5C Configurator" development project.  These Sun employees and others created Sun's W5C Configurator by developing functional companions for the simple configuration solution supplied to Sun by Oracle.  Sun continued its use of Trilogy's product configuration software during its development project, but eventually phased out Trilogy's Configurator when the W5C Configurator was completed in May 2005.

58.     Upon information and belief, Sun developed its W5C Configurator with trade secrets and confidential and proprietary information belonging to Trilogy.  Sun gained access to these trade secrets and confidential and proprietary information pursuant to the Agreements, which prohibit such use.  Sun also gained access to Trilogy's trade secrets and confidential and proprietary information from two former Trilogy employees, Shyam Lakshman and Jean Murray, a former Trilogy contractor, Evan Kempner, and the Sun employees who were trained on Trilogy's software under the Agreements.  Sun induced some or all of these individuals to improperly disclose Trilogy's trade secrets and confidential and proprietary information for use in the development of Sun's W5C Configurator.

**D.      Sun Hires Shyam Lakshman**

59.     Shyam S. Lakshman ("Lakshman") formerly worked for pcOrder.com, a Trilogy subsidiary.  While at pcOrder.com, Lakshman was a key modeler using Trilogy's proprietary and trade secret configuration technology.

60.     On or about September 11, 1995, Lakshman signed a Proprietary Information Agreement  under which he agreed not to use in any unauthorized manner or to disclose confidential, proprietary, or trade secret information of Trilogy to any third party at any time during or after his employment by Trilogy.  As Lakshman acknowledged in his Proprietary Information Agreement:

> I understand that my work as an employee of Trilogy will involve access to and creation of confidential (including trade secrets) and proprietary information (collectively, "Proprietary Information").  I agree to keep all Proprietary Information in trust for the benefit of Trilogy.  I will never use any Proprietary Information, except as required by my duties to Trilogy.  I understand that this prohibition on use or disclosure prevents me from discussing Proprietary Information, even in general terms, with persons outside Trilogy.

"Proprietary Information" means information, ideas, and materials of or about Trilogy or its affiliates, employees, customers, or others with whom Trilogy conducts business. Proprietary Information that is not generally known to the software industry or the public is confidential, and I agree to exercise diligence at all times to maintain the confidentiality of all confidential Proprietary Information and not disclose confidential Proprietary Information. I understand that my obligation to keep Proprietary Information strictly confidential shall survive the termination of my employment and/or this agreement.

Proprietary Information includes, without limitation, information, ideas or materials of a technical nature such as research and development results, software design and specifications, source and object code, training and training materials, invention disclosures, patent applications, and other materials and concepts relating to Trilogy's products and processes. Proprietary Information also includes information, ideas, or materials of a business nature such as non-public financial information; information relating to profits, costs, marketing, strategy, purchasing, sales, customers, suppliers, contract terms, employees, and salaries, product development plans; business and financial plans and forecasts, and marketing and sales plans and forecasts.

61.     During the course of his employment by pcOrder.com, Lakshman acquired confidential, trade secret, and highly proprietary information concerning all aspects of Trilogy's product configuration software.

62.     Lakshman resigned from his position at Trilogy's subsidiary pcOrder.com on February 11, 1997.

63.     Sun hired Lakshman after his departure from Trilogy. After Sun licensed Trilogy's product configuration software in November 1998, Lakshman became the technical deployment lead for Trilogy's Configurator at Sun.

64.     Upon information and belief, in or around August 2002, after working with Trilogy's Configurator in use at Sun for more than three years, Lakshman transitioned from his position as technical deployment lead for Trilogy's Configurator in use at Sun to technical architecture lead for Sun's W5C Configurator project.

65.     Upon information and belief, while working on Sun's W5C Configurator project, Lakshman utilized and disclosed confidential, proprietary, and trade secret information regarding Trilogy's configuration software that he acquired while employed by Trilogy's subsidiary pcOrder.com and while working with Trilogy's Configurator in use at Sun.

**E.     Sun Hires Jean Murray**

66.     Jean Murray ("Murray") is a former Trilogy employee.  While employed by Trilogy, Murray acted as the program manager for the deployment of Trilogy's configuration software at Sun.

67.     On or about July 6, 1999, Murray signed a Proprietary Information Agreement under which she agreed not to use in any unauthorized manner or to disclose confidential, proprietary, or trade secret information of Trilogy to any third party at any time during or after her employment by Trilogy.  As Murray acknowledged in her Proprietary Information Agreement:

> I understand that my work as an employee of Trilogy will involve access to and creation of confidential (including trade secrets) and proprietary information (collectively, "Proprietary Information").  I agree to keep all Proprietary Information in trust for the benefit of Trilogy.  I will never use any Proprietary Information, except as required by my duties to Trilogy.  I understand that this prohibition on use or disclosure prevents me from discussing Proprietary Information, even in general terms, with persons outside Trilogy.

> "Proprietary Information" means information, ideas, and materials of or about Trilogy or its affiliates, employees, customers, or others with whom Trilogy conducts business.  Proprietary Information that is not generally known to the software industry or the public is confidential, and I agree to exercise diligence at all times to maintain the confidentiality of all confidential Proprietary Information and not disclose confidential Proprietary Information.  I understand that my obligation to keep Proprietary Information strictly confidential shall survive the termination of my employment and/or this agreement.

> Proprietary Information includes, without limitation, information, ideas or materials of a technical nature such as research and development results, software

design and specifications, source and object code, training and training materials, invention disclosures, patent applications, and other materials and concepts relating to Trilogy's products and processes. Proprietary Information also includes information, ideas, or materials of a business nature such as non-public financial information; information relating to profits, costs, marketing, strategy, purchasing, sales, customers, suppliers, contract terms, employees, and salaries, product development plans; business and financial plans and forecasts, and marketing and sales plans and forecasts.

68.     During the course of her employment with Trilogy, Murray acquired confidential, trade secret, and highly proprietary information concerning all aspects of Trilogy's configuration software.

69.     On or about December 3, 2003, Sun approached Trilogy and asked whether Trilogy would object if Sun hired Murray.  According to Sun, Murray would continue to work with Trilogy's Configurator in her new position at Sun, performing essentially the same role that she had been assigned while working for Trilogy.  Based on Sun's representation regarding Murray's expected job function at Sun, Trilogy indicated that it would not object to Sun hiring Murray, provided that Murray abided by her ongoing confidentiality obligations to Trilogy in her new job.

70.     Upon Murray's departure from Trilogy, Murray and Trilogy executed a contract entitled "Employment Separation Agreement and Voluntary Release," which incorporated by reference Murray's Proprietary Information Agreement.  Murray's separation from Trilogy was effective as of March 31, 2004.

71.     Upon information and belief, Murray did not continue to work primarily with Trilogy's Configurator in use at Sun after becoming a Sun employee.  Rather, Murray became the program manager for Sun's W5C Configurator project.

72.     Upon information and belief, while working on Sun's W5C Configurator project, Murray utilized and disclosed confidential, proprietary, and trade secret information regarding Trilogy's configuration software that she acquired while employed by Trilogy.

### F.     Sun Hires Evan Kempner

73.     Trilogy hired Evan Kempner ("Kempner") as a contractor in April 2000.  At the time of his employment by Trilogy, Kempner was an employee of Onward, Inc. ("Onward"). Kempner's job duties as a Trilogy contractor included modeling computer products to be deployed at Sun, maintaining those models, and training Sun employees on Trilogy's configuration software.

74.     On or about April 24, 2000, Kempner signed a "Nondisclosure Agreement For Consultants," pursuant to which he agreed not to use in any unauthorized manner or to disclose confidential, proprietary, or trade secret information of Trilogy to any third party at any time during or after the termination of his business relationship with Trilogy.  As Kempner acknowledged in the Nondisclosure Agreement For Consultants:

> **WHEREAS**, Trilogy in the course of its dealings with Consultant may furnish to Consultant "Confidential Information" as defined in Paragraph 1 and does not wish to convey any interest of copyright therein to Consultant, or make such Confidential Information public or common knowledge to be disclosed to any third party, or permit any use thereof except to engage in such discussions; and
>
> **NOW, THEREFORE,** in consideration of the business discussions, disclosure of Confidential Information and any future business relationship between the parties, it is hereby agreed as follows:
>
> 1.  **CONFIDENTIAL INFORMATION:**  For purposes of this Agreement, the term "Confidential Information" includes but is not limited to the following:
>
> Any information, business plan, concept, idea, know-how, process, technique, program, design, formula, algorithm or work-in-progress, any engineering, manufacturing, marketing, technical, financial, data, or sales information, pricing or business information, or any information regarding suppliers, customers, employees, investors, or business operations, and any other information or

materials, whether written, or graphic, or any other form or that is disclosed orally, or electronically, whether tangible or intangible and in whatever form or medium provided, or otherwise which is learned or disclosed in the course of discussions, studies, or other work undertaken between the parties.

Without limiting the generality of the foregoing, Confidential Information shall include all information and materials disclosed orally or in any other form, regarding Trilogy's software products or software product development, including, but not limited to, the configuration techniques, data classification techniques, user interface, applications programming interfaces, data modeling and management techniques, data structures, and other information of or relating to Trilogy's software products or derived from testing or other use thereof. Confidential Information shall not include any information included under Paragraph 7.

2. **JOINT UNDERTAKING**. Consultant agrees that Consultant will not at any time disclose, give or transmit in any manner or form or for any purpose, the Confidential Information received from Trilogy to any person, party, firm or corporation entity, or use such Confidential Information for its own benefit or the benefit of anyone else, or for any purpose other than to engage in discussions regarding possible business relationship involving both Consultant and Trilogy. Without limitation of the generality of the foregoing, Consultant may not use, refer to, or otherwise benefit from the Confidential Information of Trilogy in connection with Consultant's market research, competitive analysis, development, planning, marketing or other business activities.

Consultant shall take all reasonable measures to preserve the confidentiality and avoid the disclosure of Trilogy's Confidential Information, including, but not limited to, those steps taken with respect to Consultant's own confidential information or like importance. Consultant shall not disassemble, decompile or otherwise reverse engineer any software product of Trilogy's and, to the extent any such activity may be permitted, the results thereof shall be deemed Confidential Information subject to the requirements of this Agreement.

75. Kempner's work on behalf of Trilogy was also performed subject to the August 10, 1997 Confidentiality Agreement between Onward and Trilogy, the confidentiality obligations set forth in Section 6 of the August 11, 1997 Computer Consulting Services Agreement between Onward and Trilogy, together with Addendum #1 and Addendum #2 to that agreement, and the confidentiality obligations set forth in Section 4 of the November 6, 2000 Consultant Agreement between Onward and Trilogy.

76.     In his role as a Trilogy contractor, Kempner acquired confidential, trade secret, and highly proprietary information concerning all aspects of Trilogy's configuration software.

77.     On or about August 26, 2002, Sun approached Trilogy and asked whether Trilogy would object if Sun hired Kempner.  Sun indicated that, in his new position at Sun, Kempner would continue to model computer products to be deployed at Sun and replace Lakshman as the technical deployment lead for Trilogy's Configurator in use at Sun.

78.     In a September 9, 2002 letter to Sun's Sze Fen Tan, Trilogy indicated that it would not object if Sun hired Kempner, as long as Kempner abided by his ongoing confidentiality obligations to Trilogy.  In that letter, Trilogy reminded Sun that Kempner "had access to very significant Trilogy Confidential Information" and reiterated its expectation "that Sun will take all necessary steps to ensure that Mr. Kempner and any other individuals who have had access to Trilogy Confidential Information will not use or disclose the information in any manner not expressly permitted."  Trilogy also stated that Kempner "should be informed that he may not provide Sun with Trilogy Confidential Information that he accessed during his previous engagements in connection with Trilogy products and/or services."  On or about September 26, 2002, Sun assured Trilogy in writing that it would take appropriate steps to ensure compliance with Sun's contractual confidentiality obligations to Trilogy upon hiring Kempner.

79.     Also in September 2002, Trilogy reminded Kempner in writing of his continuing obligations to Trilogy pursuant to his Nondisclosure Agreement for Consultants.

80.     Upon information and belief, in the fall of 2003, Kempner began working simultaneously as both technical deployment lead for Trilogy's Configurator in use at Sun and as technical deployment lead for Sun's W5C Configurator project.

81.     Upon information and belief, while working on Sun's W5C Configurator project, Kempner utilized and disclosed confidential, proprietary, and trade secret information regarding Trilogy's product configuration software that he acquired while employed by Trilogy and while working with the Trilogy Configurator at Sun.

**G.     Versata Sues Sun for Patent Infringement and Trade Secret Misappropriation**

82.     On September 9, 2006, Versata sued Sun for infringing the '524, the '798, and the '854 patents.  In addition, Versata sued Sun for breach of contract, tortious interference with existing contract, and trade secret misappropriation.

**H.     Sun Retaliates by Filing This Lawsuit**

83.     On November 30, 2007, Sun filed a complaint against Versata Enterprises, Inc., Versata Software, Inc., Versata Development Group, Inc., Versata Computer Industry Solutions, Inc., Versata, Inc., Trilogy, Inc., and Nextance, Inc. (collectively "Versata") for alleged infringement of the following four patents:  U.S. Patent Nos. 6,832,223 ("the '223 patent"); 5,870,719 ("the '719 patent"); 5,963,950 ("the '950 patent"); and 5,761,662 ("the '662 patent") (collectively the "Sun Patents").

84.     Prior to filing suit, Sun did not provide notice to Versata of its alleged infringement of any of the Sun Patents.

85.     In its Complaint, Sun alleged that Versata has "made, used, offered for sale and/or sold in the United States a system that infringes one or more claims of the '223 patent."  Sun did not specify in its Complaint, which "system" allegedly infringed the '223 patent.

86.     In its Complaint, Sun alleged that Versata has "made, used, offered for sale and/or sold in the United States a system that infringement one or more claims of the '719 patent."  Sun did not specify in its Complaint, which "system" allegedly infringed the '719 patent.

87.     In its Complaint, Sun alleged that Versata has "made, used, offered for sale and/or sold in the United States a system that infringement one or more claims of the '950 patent."  Sun did not specify in its Complaint, which "system" allegedly infringed the '950 patent.

88.     In its Complaint, Sun alleged that Versata has "made, used, offered for sale and/or sold in the United States a system that infringement one or more claims of the '662 patent."  Sun did not specify in its Complaint, which "system" allegedly infringed the '662 patent.

89.     On December 17, 2007, counsel for Versata sent a letter to counsel for Sun, requesting that Sun "file an Amended Complaint that identifies, for each asserted patent:  (1) the particular system that allegedly infringes that patent (by trade name); and (2) the defendant that allegedly makes, uses, offers for sale, or sells that system."

90.     On December 24, 2007, counsel for Sun, sent an email message to counsel for Versata, stating that "the '950 and '662 patents are infringed at least by your client's contract management software product, the '223 is infringed at least by your client's Logic Suite product, the '719 patent is infringed at least by your client's Logic Server product, and the latter two patents are also likely infringed by your client's business rules management system."

91.     Versata is informed and believes and thereupon alleges that Sun's claim of infringement of the '950 patent by Versata is made in bad faith and constitutes sham litigation. Versata is informed and believes and thereupon alleges that Sun's claim is objectively baseless, because no reasonable litigant could conclude that Sun's infringement allegations relating to the '950 patent are reasonably calculated to elicit a favorable outcome.  Moreover, Versata is

informed and believes and thereupon alleges that Sun did not have probable cause to allege that Versata infringed the '950 patent, because each claim of the '950 patent is either invalid, unenforceable, or plainly not infringed by Versata's products.  Further, Versata is informed and believes and thereupon alleges that Sun's claim is subjectively baseless, because Sun claim of infringement is merely an attempt to conceal Sun's attempt to interfere directly with the business relationships of Versata.

92.     Versata is informed and believes and thereupon alleges that Sun's claim of infringement of the '662 patent by Versata is made in bad faith and constitutes sham litigation. Versata is informed and believes and thereupon alleges that Sun's claim is objectively baseless, because no reasonable litigant could conclude that Sun's infringement allegations relating to the '662 patent are reasonably calculated to elicit a favorable outcome.  Moreover, Versata is informed and believes and thereupon alleges that Sun did not have probable cause to allege that Versata infringed the '662 patent, because each claim of the '662 patent is either invalid, unenforceable, or plainly not infringed by Versata's products.  Further, Versata is informed and believes and thereupon alleges that Sun's claim is subjectively baseless, because Sun claim of infringement is merely an attempt to conceal Sun's attempt to interfere directly with the business relationships of Versata.

93.     Versata is informed and believes and thereupon alleges that Sun's claim of infringement of the '223 patent by Versata is made in bad faith and constitutes sham litigation. Versata is informed and believes and thereupon alleges that Sun's claim is objectively baseless, because no reasonable litigant could conclude that Sun's infringement allegations relating to the '223 patent are reasonably calculated to elicit a favorable outcome.  Moreover, Versata is informed and believes and thereupon alleges that Sun did not have probable cause to allege that

Versata infringed the '223 patent, because each claim of the '223 patent is either invalid, unenforceable, or plainly not infringed by Versata's products. Further, Versata is informed and believes and thereupon alleges that Sun's claim is subjectively baseless, because Sun claim of infringement is merely an attempt to conceal Sun's attempt to interfere directly with the business relationships of Versata.

94.      Versata is informed and believes and thereupon alleges that Sun's claim of infringement of the '719 patent by Versata is made in bad faith and constitutes sham litigation. Versata is informed and believes and thereupon alleges that Sun's claim is objectively baseless, because no reasonable litigant could conclude that Sun's infringement allegations relating to the '719 patent are reasonably calculated to elicit a favorable outcome. Moreover, Versata is informed and believes and thereupon alleges that Sun did not have probable cause to allege that Versata infringed the '719 patent, because each claim of the '719 patent is either invalid, unenforceable, or plainly not infringed by Versata's products. Further, Versata is informed and believes and thereupon alleges that Sun's claim is subjectively baseless, because Sun claim of infringement is merely an attempt to conceal Sun's attempt to interfere directly with the business relationships of Versata.

**I.        Sun Attempts to Monopolize the Relevant Market in Web-Enabled Software Platforms in the United States**

95.      Versata is informed and believes and thereupon alleges that, by filing this lawsuit, Sun has attempted to acquire and unlawfully exploit monopoly power. More specifically, Sun has engaged in predatory or anticompetitive conduct with specific intent to monopolize, and there is a dangerous probability of Sun achieving monopoly power.

96.     The relevant product market is the market for web-enabled software platforms.

97.     The relevant geographic market is the United States.

98.     Sun's conduct has achieved, or has a dangerous probability of achieving monopoly power over the relevant product and geographic markets, unless such conduct is restrained and enjoined.  If not restrained and enjoined, all manufacturers of web-enabled software platforms in the United States will be forced to enter into anticompetitive license agreements with Sun, thereby giving Sun control over 100% of the relevant product and geographic markets and thereby increasing its monopoly power and monopoly control thereover.

99.     In fact, if Sun's public statements are accepted as true, Sun has already achieved monopoly power and monopoly control over the relevant markets.  According to a Sun press release:

> Since its introduction in May 1995, the Java platform has been adopted more quickly across the industry than any other technology in computing history.  All major computing platform vendors have signed up to integrate Java technology as a core component of their products.  What got the Java platform from there to here appears to have been sheer momentum.  As Lisa Friendly said, "The developer's really made all this happen.  It wasn't the hype."

(Exhibit A, Jon Byous, *Java Technology:  The Early Years*, April 2003, *available at* http://java.sun.com/features/1998/05/birthday.html.)

100.    Sun's monopoly power over the relevant product and geographic markets has not been acquired or achieved as a result of business growth or development or legitimate acquisition and enforcement of patents, or as a consequence of superior technology, business acumen, or historic accident.  Rather, Sun has achieved monopoly power through predatory and anticompetitive conduct, such as filing the present lawsuit, which it engaged in with specific intent to obtain monopoly power.

101.     Sun's conduct has had a substantial effect on interstate commerce, and it will continue to have such an effect.

102.     As a direct and proximate cause of Sun's unlawful attempted monopolization, Versata has been injured in its business and property in an amount that has yet to be determined but will be established at trial.

103.     Unless Sun is enjoined by a court of law, Sun's unlawful conduct will continue and Versata will continue to sustain injury and damage.

## COUNT SIX

### ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2
### WALKER PROCESS FRAUD ('719 PATENT)

104.     Versata hereby realleges and incorporates by reference the preceding allegations of these counterclaims.

105.     The patent application that resulted in the '719 patent was filed on July 3, 1996 and was assigned Application No. 08/675,683 ("the '719 Application") by the United States Patent and Trademark Office ("PTO").

106.     The '719 patent, entitled "Platform-Independent, Usage-Independent, and Access-Independent Distributed Quote Configuration System" issued on February 9, 1999.

### A.     The Independent Claims of the '719 Patent Require Either or Both of the User Interface and the Server Interface to Include "Platform Independent Byte-Codes"

107.     Claim 1 of the '719 patent claims "a quote configurator comprising:  a client module … having a user interface… and a server … including a server interface."  Claim 1 further claims that "said user interface and said server interface being comprised of platform independent byte-codes."

108.     Claim 2 of the '719 patent claims "wherein the client module is JAVA compatible."  Claim 5 of the '719 patent claims "wherein the server is JAVA compatible."  Claim 6 of the '719 patent claims "wherein the client interface byte-codes are interpreted for operation on a particular client platform."  Claim 7 of the '719 patent claims "wherein the server interface byte-codes are interpreted for operation on a particular server platform."

109.     Claim 12 of the '719 patent claims a "method for configuring quotes comprising: receiving quote input and command selections from a user via a user interface in a client module, … sending said quote input and command selections to a server across a server interface, said user interface and said server interface being comprised of platform independent byte-codes."

110.     Claim 15 of the '719 patent claims "wherein the client module is JAVA compatible."  Claim 16 of the '719 patent claims "wherein the server is JAVA compatible."  Claim 17 of the 719 patent claims "interpreting the client interface byte-codes for operation on a particular client platform."  Claim 18 of the '719 patent claims "interpreting the server interface byte-codes for operation on a particular server platform."

111.     Claim 23 of the '719 patent claims "said user interface and said server interface being comprised of platform independent byte-codes."

112.     Claim 24 of the '719 patent claims "said server interface being comprised of platform independent byte-codes."

113.     Therefore, all of the claims of the '719 patent include the "platform independent byte-codes" limitation.

B.     **Throughout Prosecution, the Patent Examiner Refused to Allow Sun's Proposed Claims Based Solely on a "Platform-Independent User Interface" and/or a "Platform Independent Server Interface" as Anticipated and/or Obvious in View of the Prior Art**

114.    When Sun filed the '719 Application, none of the independent claims included the "platform independent byte-codes" limitation.

115.    On or around October 3, 1997, the patent examiner issued an office action rejecting all 24 claims pending in the '719 Application.  Claims 1-3, 12-14, 23, and 24 were all rejected under 35 U.S.C. § 102(e) "as being clearly anticipated by Dudle et al (5,570,291)."  Claims 1-3, 12-14, 23 and 24 were also all rejected under 35 U.S.C. § 102(b) "as being clearly anticipated by Yajima et al (5,331,543)."  Claims 4-11 and 15-22 were rejected under 35 U.S.C. § 103(a) "as being unpatentable over either Yajima et al (5,331,543) or Dudle et al (5,570,291) … in view of an obvious modification."

116.    In response to the examiner's rejection, Sun filed an Amendment and Response to Office Action that was received by the PTO on February 9, 1998.  In that response, Sun stated that "neither Yajima nor Dudle disclose a 'platform-independent user interface' or a 'platform-independent interface' as recited in amended claim 1."

117.    Sun further stated that:

"Platform-independent," as it is understood and defined in the specification, means that all common configuration and usage models are enabled by a single architecture and single user interface model independent of the machine implementation.  The user interface and server interface of amended claim 1 are platform independent, then, in that both are implemented without platform-specific code, and without the need to create multiple interface versions to support multiple platforms.  In one embodiment, this is accomplished using JAVA™, which is an object-oriented programming language similar to C++.  JAVA is unique in that a program written in JAVA is compiled into byte-codes and subsequently interpreted into machine dependent processor instructions.  Byte-codes are similar to machine instructions, but are not specific to a particular machine or platform.  Thus, JAVA programs can run on any platform that

supports JAVA.  In is not necessary to recompile a JAVA program to run on a new machine.

118.     Sun further stated that:

Moreover, Dudle is silent as to implementing platform independency.  Applicants submit that platform-independency, as defined in the specification, was not known by those skilled in the art at the time of Dudle.  Therefore, Dudle does not enable a 'platform-independent user interface' or 'platform independent server interface' as recited in amended claim 1.  Thus, Applicants respectfully submit that Dudle does not anticipate amended claim 1, for at least the reasons discussed above.

119.     Sun further stated that:

Moreover, like Dudle, Yajima is silent as to implementing platform independency.  Applications submit that platform-independency, as defined in the specification, was not known by those skilled in the art at the time of Yajima.  Therefore Yajima does not enable a "platform-independent user interface" or "platform independent server interface" as recited in amended claim 1.  Thus, Applicants respectfully submit that Yajima does not anticipate amended claim 1, for at least the reasons discussed above.

120.     Sun went on to state that:

Applicants respectfully submit that the arguments presented above with respect to amended claim 1 similarly apply to claims 12, 23, and 24, as amended, in that each includes a 'platform-independent server interface," and claims 12 and 23 also include a 'platform-independent user interface.'  Thus, for at least the reasons discussed above, Applicants respectfully submit that claims 12, 23, and 24, as amended, are not anticipated by Yajima or Dudle.

121.     Sun also stated that, "Given that claims 2 and 3 from claim 1, and claims 13 and

14 depend from claim 12, Applicants respectfully submit that claims 2, 3, 13, and 14 are likewise

not anticipated by Yajima or Dudle for at least the reasons discussed above."

122.     Sun also argued that:

Claims 4-11 depend from amended claim 1, and claims 15-22 depend from amended claim 12.  As discussed above, Applicants respectfully submit that neither Yajima nor Dudle suggest or disclose a "platform-independent user interface" or "platform independent server interface" as recited in amended claims 1 and 12.  Neither Dudle nor Yajima enable platform independency, as discussed

above.  Thus, Applicants respectfully submit that claims 4-11 and 15-22 are not obvious in light of Yajima or Dudle for at least the reasons discussed above.

123.    Thus, Sun tried to distinguish all 24 pending claims from the prior art on the basis that the prior art did not disclose "platform independency."

124.    In response to Sun's arguments, the patent examiner issued an office action, on or around March 30, 1998, again rejecting all 24 claims pending in the '719 Application.  Again, claims 1-3, 12-14, 23, and 24 were all rejected under 35 U.S.C. § 102(e) "as being clearly anticipated by Dudle et al (5,570,291)."  Claims 1-3, 12-14, 23 and 24 were also all rejected again under 35 U.S.C. § 102(b) "as being clearly anticipated by Yajima et al (5,331,543)."  Finally, claims 4-11 and 15-22 were rejected again under 35 U.S.C. § 103(a) "as being unpatentable over either Yajima et al(5,331,543) or Dudle et al (5,570,291) … in view of an obvious modification."

125.    With respect to the § 102 rejections, the patent examiner stated:

[I]t is respectfully noted that at the time the invention was made the computer systems were designed, i.e. standardized, so that any program written to operate within anyone of the DOS, MSDOS, WINDOWS, NT WINDOWS, or UNIX operating systems could be moved from one computer system, i.e. platform, using the appropriate operating system to any other computer system, i.e. platform, that used the same operating system.  Where is standardization of the design of computer systems and programs was required to meet the needs of the consumer.  Hence, programs are platform independent and applicant's arguments are not persuasive.

126.    The patent examiner further added that:

[I]t is respectfully noted that at the time the invention was made the systems of each of Yajima et al ('543) and Dudle et al ('291) taught the claimed limitations by disclosing the claimed functions on a generic computer system, i.e. platform, the systems of each of Yajima et al ('543) and Dudle et al ('291) anticipate the instant claims.  Hence, applicant's arguments are not persuasive.

127. With regard to the § 103 obviousness rejection, the patent examiner stated:

[S]ince the systems of each of Yajima et al ('543) and Dudle et al ('291) teach the required over all function/purpose of the system but do not disclose … either a specific protocol or the system's components, it would be obvious to one of ordinary skill at the time the invention was made that the systems of Yajima et al ('543) and Dudle et al ('291) could be modified to use any suitable interface language/protocol/program which would allow the systems of Yajima et al ('543) and Dudle et al ('291) to accomplish the required function/purpose of allowing a user to remotely complete an order.

128. The patent examiner further stated:

[I]t is respectfully noted that at the time the invention was made the systems of each of Yajima et al ('543) and Dudle et al ('291) clearly suggested the claimed limitations by generically disclosing the claimed functions on a generic computer system, i.e. platform. Therefore, the systems of each of Yajima et al ('543) and Dudle et al ('291) would have suggested to a skilled artisan by example of the desired functions how to implement the claimed invention and hence, applicant's arguments are not persuasive.

129. In response to the patent examiner's rejection under § 102, Sun filed a Response Under 37 C.F.R. §1.116 - Expedited Procedure that was received by the PTO on May 22, 1998. In that response, Sun stated that "neither Dudle nor Yajima suggest, disclose, or enable a 'platform-independent' user interface as claimed in claims 1, 12, 23, and 24."

130. In response to the patent examiner's rejection under § 103, Sun stated "neither Yajima nor Dudle suggest, disclose, or enable a 'platform-independent' user interface as claimed in claims 1 and 12.

131. In making these arguments relating to lack of anticipation and obviousness, Sun asserted that the patent examiner had not defined the term "platform" correctly. Sun stated: "'Platform,' as it is understood and defined in the specification, means the combination of hardware architecture and operating system."

132.    As a result, Sun argued:

Thus, the user interface and server interface of claim 1 are platform independent in that both are implemented without hardware-specific code and without operating system-specific code, eliminating the need to create multiple interface versions to support multiple hardware architectures or operating systems.

133.    In response to Sun's arguments, the patent examiner issued an Advisory Action in 1998, advising Sun that all 24 claims pending in the '719 Application remained rejected.  The patent examiner also stated that his previous rejections in the Office Action dated March 30, 1998, had "clearly define[d] a platform as a combination of a computer hardware and operating system, since neither the hardware or operating system are useful with out [sic] the other component."

C.    **Sun Convinces the Patent Examiner that the Point of Novelty is "Platform Independent Byte Codes"**

134.    In response to the Advisory Action, Sun filed a Continued Prosecution Application and a Preliminary Amendment that was received by the PTO on July 30, 1998.

135.    In the Preliminary Amendment, Sun amended the independent claims to delete the adjective "platform-independent" associated with the terms "user interface" and/or "server interface."

136.    In the Preliminary Amendment, Sun further amended the independent claims to add the concept of either of both of the user interface and server interface including "platform independent byte-codes."

137.    Specifically, Sun amended independent claims 1 and 23 to add the phrase "said user interface and said server interface being comprised of platform independent byte codes." Sun amended independent claim 12 to add the phrase "said user interface and server interface

being comprised of platform independent byte codes." Sun amended independent claim 24 to

add the phrase "said server interface being comprised of platform independent byte codes."

138.    In the Preliminary Amendment, Sun stated:

In amended claim 1, a user interface and a server interface are "comprised of
platform independent byte-codes." That is, as stated in the specification and
understood by those skilled in the art, "Byte-codes are similar to machine
instructions; however byte-codes are not specific to a particular machine or
platform," … wherein "platform" means a hardware architecture with an
operating system…. Therefore, the user interface and server interface may be
"written without platform-specific code and without the need to create multiple
versions that support multiple platforms," so that they "can run on any platform
that supports" the byte-codes….

139.    To preempt a potential rejection under 35 U.S.C. § 102, Sun argued:

Applicants respectfully submit that neither Dudle nor Yajima suggest, disclose, or
enable "platform independent byte-codes" as claimed in amended claim 1.
Moreover, neither suggests, discloses, or enables "a user interface" or a "server
interface" comprised of "byte-codes" which can run on any combination of
hardware architecture and operating system which supports the byte-codes as
claimed in amended claim 1. Thus, for at least the reasons discussed above,
Applicants respectfully submit that amended claim 1 is not anticipated by Dudle
or Yajima.

140.    Sun further argued:

Applicants respectfully submit that the reasoning discussed above similar[ly]
applies to amended claims 12, 23, and 24 in that each includes elements
comprised of "platform independent byte-codes." Thus, Applicants respectfully
submit that amended claims 12, 23, and 24 are likewise not anticipated by Dudle
or Yajima for at least the reasons discussed above.

141.    To address potential objections relating to obviousness under 35 U.S.C. § 103,

Sun argued:

Claims 4-11 depend from amended claim 1, and claims 15-22 depend from
amended claim 12. As discussed above, Applicants respectfully submit that
neither Yajima nor Dudle suggest, disclose, or enable "platform-independent
byte-codes" as amended in claims 1 and 12. Thus, Applicants respectfully submit
that claims 4-11 and 15-22, as amended, are not obvious in light of Yajima or
Dudle for at least the reasons discussed above.

142.    On August 29, 1998, the patent examiner issued a Notice of Allowability, which allowed the present claims 1–24 of the '719 Patent.  Clearly, Sun convinced the patent examiner that the point of novelty for each of the independent claims was the either or both of the user interface and the server interface included "platform independent byte-codes."

### D.    Sun Failed to Disclose to the PTO that Java Was Prior Art

143.    More than one year before Sun filed the '719 Application, Sun had disclosed Java to the general public.  Specifically, Sun released the first alpha release of Java to the general public on the Internet in March 1995.  (Exhibit B, *Javasoft Ships Java 1.0:  Programming Environment Available Free for Developers*, Sun Press Release, Jan. 23, 1996, *available at* http://www.sun.com/smi/Press/sunflash/1996-01/sunflash.960123.10561.xml; Exhibit A, Jon Byous, *Java Technology:  The Early Years*, April 2003, *available at* http://java.sun.com/features/1998/05/birthday.html.)

144.    On March 23, 1995, a front-page story in the *San Jose Mercury News* clearly positioned the new, soon-to-be-announced Java technology as "The Next Big Thing," according to Sun's Lisa Friendly, an original member of the Java Products Group.  (Exhibit A, Jon Byous, *Java Technology:  The Early Years*, April 2003, *available at* http://java.sun.com/features/1998/05/birthday.html; Exhibit C, David Bank, *Why Sun Thinks Hot Java Will Give You a Lift New Software Designed to Make World Wide Web's 'Home Pages' More Useful -- and Spur Computer Sales*, SAN JOSE MERCURY NEWS, Mar. 23, 1995, at 1A.)  According to Lisa Friendly, "[t]he PR team had done its job, but the newspaper took the publicity beyond all expectations.  It brought an immediate swarm of calls and inquiries from the press."  (Exhibit A, Jon Byous, *Java Technology:  The Early Years*, April 2003, *available at* http://java.sun.com/features/1998/05/birthday.html.)

145.    In the April 17–21, 1995 issue of the *PowerPC News* magazine, Java was described as programming language having an interpreter built into the user interface:

> However a new, experimental browser from Sun Microsystems could change all this. HotJava (dreadful name, great idea) had its second Alpha release last week and is the most revolutionary extension to the Web we have seen ... ever.  People tend to remember the first time they saw the World Wide Web viewed through a graphical browser - their reaction tends to be "Wow".  Java is the first thing we've seen that made us go "Wow" on the Web for more than a year.  The idea behind HotJava is quite simple - add a complete programming language and build an interpreter into the browser.  Do this, and the browser becomes essentially infinitely extensible.  The development team have already put up a few simple pages which demonstrate the flexibility of the approach.

(Exhibit D, Chris Rose, *It's the World Wide Web, But Not As We Know It*, POWERPC NEWS, Apr. 17–21, 1995, *available at* http://web.archive.org/web/20000302021144/ java.sun.com/pr/1995/04/pr950417-01.html)

146.    Additionally, the *PowerPC* article suggested that the Java programming language could be used to build a "home shopping application … and anyone with a Java-capable browser will be able to …use it."  (*Id.*)

147.    Finally, the *Power PC* article described the benefits of the Java in that it was "completely architecture neutral, with the quirks of the particular program being handled by the interpreter."  (*Id.*)

148.    Moreover, on May 23, 1995, which was more than one year before Sun filed the '719 Application, Sun and Netscape officials jointly "stepped onto a stage and announced to the SunWorld™ audience that Java™ technology was real, it was official, and it was going to be incorporated into Netscape Navigator™, the world's portal to the Internet."  (Exhibit A, Jon Byous, *Java Technology:  The Early Years*, April 2003, *available at* http://java.sun.com/features/1998/05/birthday.html.)  As explained in the article:

> The Internet was becoming popular as a way of moving media content -- text, graphics, video -- throughout a network of heterogeneous devices using HTML. Java technology had been designed in parallel to move media content across networks of heterogeneous devices, but it also offered the capability to more "behavior" in the form of applets along with the content. HTML alone could not do that, but it did set the stage for Java technology.

(*Id.*)  In the words of James Gosling, who was one of the original members of the Java Products Group and the lead engineer and key architect of the Java technology:

> Even though the Web had been around for 20 years or so, with FTP and telnet, it was difficult to use. Then Mosaic came out in 1993 as an easy-to-use front end to the Web, and that revolutionized people's perceptions. The Internet was being transformed into exactly the network that we were trying to convince the cable companies they ought to be building. All the stuff we had wanted to do, in generalities, fit perfectly with the way applications were written, delivered, and used on the Internet. It was just an incredible accident. And it was patently obvious that the Internet and Java were a match made in heaven. So that's what we did.

(*Id.*)

149.    On the same day that Sun announced the availability of Java technology, another article in the *San Jose Mercury News* reported that the Internet was expected to become a major part of the business and consumer infrastructure of the country. (Exhibit E, David Bank, *More Local Firms Join the Rush to Cash in on Internet's Growth*, SAN JOSE MERCURY NEWS, May 23, 1995, at 1D.) According to the author:

> That's because the Web is a continuation of a trend already established in the industry. Companies moving away from mainframes use networks of PCs as "clients" to retrieve and work with files and programs stored on larger computers and workstations known as "servers."

(*Id.*)

150.    Also on May 23, 1995, Starwave Corp. announced that it would begin using Sun's "dynamic new Java Internet programming language" to develop online services with enhanced features and usability. (Exhibit F, *Starwave Announces Support of New Internet Technology*

*from Sun Microsystems*, BUSINESS WIRE, INC., May 23, 1995, *available at*

http://www.lexis.com.)

151.    On September 25, 1995, the *New York Times* described the Java programming

language as "a universal translator -- enabling programs to move fluidly between incompatible

operating systems…."  (Exhibit G, John Markoff, *Making the PC Come Alive*, N.Y. TIMES, Sept.

25, 1995, *available at* http://query.nytimes.com/gst/fullpage.html?res=990CE6DD133FF93

6A1575AC0A963958260.)

152.    Additionally, before Sun filed the '719 Application, Sun issued a press release on

January 23, 1996 announcing the availability of Java 1.0.  (Exhibit B, *Javasoft Ships Java 1.0:*

*Programming Environment Available Free for Developers*, Sun Press Release, Jan. 23, 1996,

*available at* http://www.sun.com/smi/Press/sunflash/1996-01/sunflash.960123.10561.xml.)  In

the press release, Sun described Java-based applications as platform-independent.  (*Id*.)  Sun

further stated that Java supports networked applications and enables developers to write

applications once that will run on any machine.  (*Id*.)  Sun's stated goal was to "further enhance

Java as the programming standard for complex networks such as the Internet and corporate

intranets."  (*Id*.)  Finally, Sun stated "We're delighted to invite developers to download Java 1.0

immediately and start building the next killer application."  (*Id*.)

153.    Even in its own recent publications, Sun has admitted that Java was well known

in 1996:

> The first release of Java in 1996 generated an incredible amount of excitement,
> not just in the computer press, but in mainstream media such as *The New York*
> *Times*, *The Washington Post*, and *Business Week*.  Java has the distinction of
> being the first and only programming language that had a 10-minute story on
> National Public Radio. A $100,000,000 venture capital fund was set up solely for
> products produced by use of a *specific* computer language.  It is rather amusing to
> revisit those heady times….

(Exhibit H, Cay S. Horstman & Gary Cornell, Core Java™2 Volume 1 - Fundamentals 1 (Sun

Microsystems Press, 7th ed. 2005).)

154.   In a December 4, 1995 issue of *Business Week*, Java and the Java virtual machine

were described as follows:

> Java is a computer language that Sun Microsystems Inc. designed just for network
> computing.  Any program written in Java can run in any computer or digital
> device, from PCs to machine tools.  Sounds like like hocus-pocus?  It's not.  But
> there is a gimmick:  To make the setup work, you must hide a separate Java
> "computer" inside each gadget.
>
> The computer is a "virtual machine," a piece of software that lets any computer
> simulate, perfectly, an ideal and standardized Java computer.  As far as any Java
> program knows, this simulation is the genuine article--a complete computer with
> disk drive, display, memory, and everything else.  The virtual machine executes
> Java programs by "interpreting" their commands one by one and commanding the
> underlying computer to perform all the tasks needed to write text to a screen or
> pull data from a disk, say.  There's a small penalty to be paid in performance
> because of this interpretation step.  But the two-step procedure also helps:  No
> Java program is allowed to really penetrate your computer, so you can be
> reasonably certain it won't unleash viruses to infect your system.

(Exhibit I, John W. Verity, *Meet Java, The Invisible Computer*, BUSINESS WEEK, Dec. 4, 1995.)

155.   The above-mentioned *Business Week* article even described a Java-based interface

for on-line shopping:

> The possibilities are nearly limitless.  EarthWeb, a New York Web developer,
> wants to let people shop online by dragging pictures of items into a shopping cart,
> for example.  "Java's empowering a tremendous wave of new development by
> small developers who couldn't afford to work with Microsoft,"says Nova
> Spivack, executive vice-president.

(*Id.*)

156.   Another *Business Week* article in the same issue described the public awareness of

Java at the time as "JAVA'S MASSIVE BUZZ."  (Exhibit J, Amy Cortese *et al.*, *The Software*

*Revolution*, BUSINESS WEEK, Dec. 4, 1995.)

157.    On December 8, 1995, the *Washington Post* characterized the Java programming language as the "hot new software craze sweeping the World Wide Web computer network." (Exhibit K, Elizabeth Corcoran, *Microsoft Says It Endorses Sun's Java Programming*, WASH. POST, Dec. 8, 1995.)

158.    On December 10, 1995, about seven months before the '719 Application was filed, the *Washington Post* reported about a Java-based interface for a quote configuration system:

> Technology experts at Anderson Consulting's Center for Strategic Technology in Palo Alto, for instance, have built a model of how a company might use state-of-the-art technology to change the way it works and interacts with customers. As part of that demonstration, said Joe Carter, managing partner at the center, they have created a Java-based "interactive" order form.
>
> Imagine, Carter said, how a company that makes a 20-ton industrial pump might receive orders from customers. Even though the basic pump design would always be the same, the company might add different features or use different materials for every order. A customer who uses the pump to handle corrosive chemicals has different needs than one who uses it to clean out slurry in a mine.
>
> Until now, the pump builder would have to send all its customers the same order form -- either on paper or electronically -- jammed with questions. But Anderson's Java form, in contrast, changes its questions based on the answers the customer provides. Once the customer has said he runs a mining company, for instance, all the queries about corrosive chemicals would go away. The form is shorter and more relevant -- and the customer gets the right product more swiftly.
>
> "We've run about 300 people through {the demonstration}," Carter said. "The level of interest is huge."

(Exhibit L, Elizabeth Corcoran, *Java Jumps Into the 'Net*, WASH. POST, Dec. 10, 1995.)

159.    At the time of the *Washington Post* article, it was common knowledge that the Java programming language allowed programs to be platform-independent:

> "If you build in Java, you're not tied to an Intel or Windows architecture, and you're not required to update the application" every time those companies changes a microprocessor or operating system design, said Eric Schmidt, chief technologist at Sun Microsystems.

"One of our slogans is: 'Java -- write once, run everywhere,'" he said.

(*Id.*)

160.     In the December 1995 issue of *Wired* magazine, a Sun engineer, Arthur van Hoff, stated that early versions of Java had bee released in December 1994.  (Exhibit M, David Bank, *The Java Saga*, WIRED, Dec. 1995, available at http://www.wired.com/wired/archive/3.12/ java.saga_pr.html.)  At the time of the *Wired* article, Sun's Java was characterized as "the hottest thing on the Web since Netscape," and Sun was "rushing to make Java a de facto standard on the burgeoning Web."  (*Id.*)  The same article reported about a Java-based interface for a quote configuration system:

> Software developers are busy shaping Java into applications that will add new life to Web browsers like Netscape and Mosaic, producing programs that combine real-time interactivity with multimedia features that have been available only on CD-ROM.  (Java is a programming language, HotJava an "interpreter" installed onto a browser, enabling Java programs delivered over the Web to run on the desktop.)  What's a Java application?  Point to the Ford Motor website, for instance, and all you'll get are words and pictures of the latest cars and trucks. Using Java, however, Ford's server could relay a small application (called an applet) to a customer's computer.
>
> From there, the client could customize options on an F-series pickup while calculating the monthly tab on various loan rates offered by a finance company or local bank.

(*Id.*)

161.     By April 1, 1996, the *New York Times* had already characterized Java as a "standard":  "New standards, like Sun Microsystems' Java network computing language and the World Wide Web, have threatened to reduce the importance of the operating system on which Microsoft has based its control of the industry.  (Exhibit N, John Markoff, *New Software for Business by Microsoft*, NEW YORK TIMES, Apr. 1, 1996.)

162.    Despite all of the public disclosure surrounding Java, none of the named inventors on the '719 patent, nor anyone else involved in the prosecution of the '719 Application, disclosed to the PTO the fact that Java was prior art.

163.    Additionally, on April 23, 1996 (which was before Sun filed the '719 Application), Sun filed patent application no. 08/636,706.  On March 20, 1998, Sun filed a continuation-in-part of application no. 08/636,706, which was patent application no. 09/044,826. The continuation-in-part application eventually issued as U.S. Patent No. 6,832,223, which Sun has accused Versata of infringing in this case.

164.    In patent application no. 08/636,706, Sun incorporated by reference two publications.  Sun identified the first publication as "*The Java™ Language Specification* (Sun Microsystems, Inc., 1993-95)" and attached a copy of the publication as Appendix A of the patent application.  Sun identified the second publication as "*The Java Virtual Machine Specification* (Sun Microsystems, Inc., 1993-95) and attached a copy of the publication as Appendix B of the patent application.  Since both publications were attached to and incorporated by reference into patent application no. 08/636,706, it is clear that the publications were dated on or prior to April 23, 1996.  In fact, the publication that Sun identified as "*The Java Virtual Machine Specification* (Sun Microsystems, Inc., 1993-95) is actually "The Java Virtual Machine Specification, Release 1.0 Beta, Draft, dated August 21, 1995.

165.    Neither the "*The Java™ Language Specification* (Sun Microsystems, Inc., 1993-95)" nor "*The Java Virtual Machine Specification* (Sun Microsystems, Inc., 1993-95) was disclosed by the named inventors or their attorneys to the patent examiner during prosecution of the '719 Application.

166.    Before the '719 Application was filed, Java's quick adoption by the computer

industry as the programming language of choice for networked applications had caused Sun's

market capitalization to nearly double in one year:

> At Sun Microsystems, a Silicon Valley old-liner that has found a new career in
> Internet products, progress is now measured in "Web weeks," said Eric Schmidt,
> Sun's chief technology officer.  The company now estimates that 20 percent of its
> in-house technical knowledge becomes obsolete each year.

> But new knowledge can quickly flourish.  It was only about a year ago that Sun
> introduced Java, an entirely new computer language designed specifically for the
> Internet.  Since then, Java has become a runaway hit for Sun, helping raise the
> company's value in the stock market by more than $6 billion to a market
> capitalization of more than $11.5 billion.

(Exhibit O, John Markoff, *A Quicker Pace Means No Peace in the Valley*, NEW YORK TIMES,

June 3, 1996.)

167.    During prosecution of the '719 patent, the named inventors and individuals

associated with the prosecution of the '719 patent failed to cite any of the above-mentioned

material prior art information, publications, and press releases relating to the availability of

JAVA and byte codes to the general public more than one year prior to the effective filing date of

the '719 patent or specifying and describing the functionality and architecture of Java prior to the

filing date of the '719 patent.  As a result, the inventors obtained the '719 patent by knowingly

and willfully misrepresenting the facts to the PTO.  Additionally, such prior art information,

publications, and press releases were withheld from the PTO with deceptive intent.

168.    Upon information and belief, if the named inventors and those associated with the

prosecution of the '719 patent had not withheld such prior art information, publications, and

press releases from the patent examiner and had not misrepresented that those of skill in the art

would not have been aware of platform-independent interfaces based on Java and/or another programming language that included byte codes, the '719 patent would not have issued.

169.    Moreover, Sun is well aware that Sun released Java to the general public in March 1995, that Sun announced the availability of Java in May 1995, and that the media had announced the availability of Java to the general public, more than one year before the filing date of the '719 Application.  As a result, Sun was aware of the fraud before it brought this lawsuit alleging infringement by Versata of the '719 patent.

170.    Sun's fraud on the PTO is actionable under Section 2 of the Sherman Act. Through this fraud, Sun has engaged in predatory or uncompetitive conduct with a specific intent to monopolize, and there is a dangerous probability of Sun achieving monopoly power in the relevant product and geographic markets.

171.    Sun's conduct has had a substantial effect on interstate commerce, and it will continue to have such an effect.

172.    As a direct and proximate cause of Sun's unlawful attempted monopolization, Versata has been injured in its business and property in an amount that has yet to be determined but will be established at trial.

173.    Unless Sun is enjoined by a court of law, Sun's unlawful conduct will continue and Versata will continue to sustain injury and damage.

## COUNT SEVEN

## INEQUITABLE CONDUCT ('719 PATENT)

174.    Versata hereby realleges and incorporates by reference the preceding allegations of these counterclaims.

175.    Versata is informed and believes and thereupon alleges that the '719 patent is unenforceable because of the inequitable conduct of the named inventors and/or those involved in the prosecution of the '719 Application before the United States Patent and Trademark Office ("PTO").  Specifically, Versata contends that the '719 patent is unenforceable due to inequitable conduct because, prior to the issuance of the '719 patent, the named inventors of the '719 patent, L.M. Maritzen, Rolando D. Dimaandal, Julia Giannella, Raul Arregui, and Mark Moss, and/or others involved in prosecuting the patent application leading to the '719 patent, as the employees or agents of Sun, were aware of information material to the patentability of the claims of the '719 patent, but withheld that information from the PTO during prosecution of the '719 patent with the intention of deceiving the PTO, and made affirmative representations to the PTO during the prosecution of the '719 patent with the intention of deceiving the PTO, including without limitation:  (a) failure to disclose information, publications, and press releases relating to the availability of JAVA and byte codes to the general public more than one year prior to the effective filing date of the '719 patent, during the prosecution of the '719 patent, each of which is material to the patentability of the claims of the '719 patent; (b) failure to cite material patents and prior art publications during the prosecution of the '719 patent, each of which is material to the patentability of the claims of the '719 patent; and (c) misrepresentation, with the intent to deceive the PTO.

176.    An actual controversy exists between Sun and Versata regarding whether the '719 patent is unenforceable because of inequitable conduct.

177.    Versata seeks a declaration that the '719 patent is unenforceable.

## COUNT EIGHT

**UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 *ET SEQ.***

178.     Versata hereby realleges and incorporates by reference the preceding allegations of these counterclaims.

179.     Versata is informed and believes and thereupon alleges that Sun's claims of infringement of the '223 patent, the '719 patent, the 950 patent, and/or the '662 patent by Versata are made in bad faith.

180.     Versata asserts this claim of unfair competition under California Business & Professions Code § 17200 *et seq*. in its own name only and does not act for the interest of any other person or entity or for the general public.  Versata has suffered in fact and has lost money and property as a result of Sun's unfair business practices.

181.     Sun's above-described conduct amounts to an unlawful business act or practice under California Business & Professions Code § 17200 *et seq*. based, *inter alia*, on restraint of trade and attempted monopolization in violation of 15 U.S.C. § 2, failure to disclose relevant patents and patent applications to Versata that led Versata to develop Java-based applications, intentional misrepresentation, concealment and negligent misrepresentation, and other claims of unlawfulness in these counterclaims.

182.     Sun's unfair conduct threatens an incipient violation of an antitrust law, violates the policy or spirit of one or more of these laws because its effects are comparable to or the same as a violation of the law, and otherwise significantly threatens or harms competition.

183.    Sun's conduct amounts to a fraudulent business act or practice under California Business & Professions Code § 17200 *et seq.* by creating a likelihood that Versata and the public would be misled as to the scope of Sun's patents.

184.    As a result of Sun's unfair competition, Versata and the public will be damaged. Versata seeks an injunction and other equitable relief preventing further harm to itself and the public, and preventing Sun from continuing its unlawful, harmful, and anticompetitive conduct. Versata further seeks restitution of all amounts that Sun has received from Versata as a result of Sun's wrongful conduct.

**COUNT NINE**

**INTENTIONAL MISREPRESENTATION & CONCEALMENT**

185.    Versata hereby realleges and incorporates by reference the preceding allegations of these counterclaims.

186.    Versata is informed and believes and thereupon alleges that Sun's claims of infringement of the '223 patent, the '719 patent, the 950 patent, and/or the '662 patent by Versata are made in bad faith.

187.    Versata is informed and believes and thereupon alleges that, by filing this lawsuit, Sun has engaged in fraud.  Sun has misrepresented material facts by false representations, concealment, or nondisclosure.  Sun misrepresented material facts with knowledge of the falsity or with lack of reasonable ground to believe in the truth of Sun's representations.  Moreover, Sun concealed or failed to disclose material facts.

188.    In 1996, Sun granted to the general public a fully-paid, nonexclusive, nontransferable, perpetual, worldwide limited license to all Sun intellectual property that was

48

required to develop Java-based programs.  (*See* Exhibit P, JAMES GOSLING, BILL JOY & GUY

STEELE, THE JAVA™ LANGUAGE SPECIFICATION (Addison-Wesley 1996).)

189.    Sun releases its Java software development kits to developers for free.  (*See, e.g.*,

Exhibit Q, Java SE Downloads, *available at* http://java.sun.com/javase/downloads/index.jsp; *see*

*also* Exhibit R, Rinaldo S. DiGiorgio, *Java Braintrust Tells All*, SUNWORLD ONLINE, Dec. 1,

1995, *available at* http://sunsite.cs.msu.su/sunworldonline/swol-12-1995/swol-12-java.html

("Java is *free*, so that's about as cheap as you can get. … What this all means is that developers

save money, which drives software prices.").)

190.    As part of the process, Sun provided developers, such as Versata, a license to use

the software development kits to design, develop, and test Java-based programs for commercial

purposes.  (*See, e.g.*, Exhibit S, License Agreement for Java EE 5 SDK Update 4 (with JDK 6

U3), available at https://cds.sun.com/is-bin/INTERSHOP.enfinity/WFS/CDS-CDS_SMI-

Site/en_US/-/USD/ViewLicense-Start?LicenseUUID=eN5IBe.o7fQAAAEWtoBrWdsU&

ProductUUID=ULhIBe.oNxkAAAEWqqlUhtpA.)

191.    In 1997, Sun granted to the general public a fully-paid, nonexclusive,

nontransferable, perpetual, worldwide limited license to all Sun intellectual property that was

required to compile and use Java-based programs.  (*See* Exhibit T, TIM LINDHOLM & FRANK

YELLIN, THE JAVA™ VIRTUAL MACHINE SPECIFICATION (Addison-Wesley 1997).)

192.    Sun also releases its Java compilers to developers, such as Versata, and the

general public for free.  Sun provides developers with a license to use the Java compiler for the

purpose of designing, developing, and testing developers' Java-based programs.  (Exhibit U, Sun

Microsystems, Inc. Binary Code License Agreement for the Java SE Runtime Environment (JRE

Version 6, *available at* http://www.java.com/en/download/license.jsp; Exhibit V, Binary Code

License Agreement for the Java SE Development Kit (JDK), Version 6, *available at* http://java.sun.com/javase/6/jdk-6u4-license.txt.)  Additionally, Sun provides end-users with a license to use the Java compiler to run Java-based programs.  (Exhibit U, Sun Microsystems, Inc. Binary Code License Agreement for the Java SE Runtime Environment (JRE Version 6, available at http://www.java.com/en/download/license.jsp.)

193.    Additionally, Sun knew that Versata would reasonably rely on Sun's misrepresentations, concealment, and/or nondisclosure, and Sun engaged in such fraudulent conduct with the intent to induce Versata to rely on Sun's misrepresentations, concealment, and/or nondisclosure.  For example, by releasing Java to the public beginning in March 1995, Sun "knew that releasing code to developers for free is one of the fastest ways to create widespread adoption."  (Exhibit A, Jon Byous, *Java Technology:  The Early Years*, April 2003, *available at* http://java.sun.com/features/1998/05/birthday.html.)  Additionally, by licensing developers to design, develop, and test Java-based programs, while failing to disclose relevant patents and patent applications such as the '223 and '719 patents to the Java development community including Versata, Sun intended to induce Versata to develop Java-based applications.  (*See, e.g.*, Exhibit B, *Javasoft Ships Java 1.0:  Programming Environment Available Free for Developers*, Sun Press Release, Jan. 23, 1996, *available at* http://www.sun.com/smi/Press/sunflash/1996-01/sunflash.960123.10561.xml. ("We're delighted to invite developers to download Java 1.0 immediately and start building the next killer application.").)

194.    Under the circumstances, including the fact that Sun specifically invited developers to develop Java-based applications, provided developers with licenses to develop Java-based programs, and provided users with licenses to run Java-based programs, Sun had a

duty to disclose its relevant patents and patent applications to the Java development community including Versata, because Sun's partial disclosures were misleading to Versata and/or Sun was aware that Versata would be unlikely to discover its relevant patents and patent applications.

195.    Versata justifiable relied on Sun's misrepresentations, concealment, and/or nondisclosure by developing Java-based applications.  Moreover, if Versata had been aware of Sun's relevant patents and patent applications, Versata would not have developed Java-based applications.

196.    As a direct and proximate cause of Sun's fraud, Versata has been injured in its business and property in an amount that has yet to be determined but will be established at trial. Additionally, Versata will continue to be further damaged in the future due to Sun's fraudulent conduct.

## COUNT TEN

### NEGLIGENT MISREPRESENTATION

197.    Versata hereby realleges and incorporates by reference the preceding allegations of these counterclaims.

198.    Versata is informed and believes and thereupon alleges that Sun's claims of infringement of the '223 patent, the '719 patent, the 950 patent, and/or the '662 patent by Versata are made in bad faith.

199.    Versata is informed and believes and thereupon alleges that, by filing this lawsuit, Sun has engaged in negligent misrepresentation.  Sun made false representations as to past or existing material fact to Versata.  Sun made such false representations without reasonable grounds to believe in the truth of its representations.

200.    Sun knew that Versata would reasonably rely on Sun's misrepresentations, and Suns engaged in such misrepresentations with the intent to induce Versata to rely thereon. Specifically, by failing to disclose relevant patents and patent applications to the Java development community including Versata, Sun intended to induce Versata to develop Java-based applications.  (*See, e.g.*, Exhibit B, *Javasoft Ships Java 1.0:  Programming Environment Available Free for Developers*, Sun Press Release, Jan. 23, 1996, *available at* http://www.sun.com/smi/Press/sunflash/1996-01/sunflash.960123.10561.xml. ("We're delighted to invite developers to download Java 1.0 immediately and start building the next killer application."); *see also* Exhibit R, Rinaldo S. DiGiorgio, *Java Braintrust Tells All*, SUNWORLD ONLINE, Dec. 1, 1995, *available at* http://sunsite.cs.msu.su/sunworldonline/swol-12-1995/swol-12-java.html ("Java is *free*, so that's about as cheap as you can get. … What this all means is that developers save money, which drives software prices.").)

201.    Versata justifiable relied on Sun's misrepresentations by developing Java-based applications.

202.    Versata has suffered damages as a result of Sun's negligent misrepresentations and will suffer additional damages in the future.

## PRAYER FOR RELIEF

WHEREFORE, Defendants, Versata Enterprises, Inc., Versata Software, Inc., Versata Development Group, Inc., Versata Computer Industry Solutions, Inc., Versata, Inc., Trilogy, Inc., and Nextance, Inc., respectfully request that this Court:

1.    Dismiss the claims alleged in Sun's Complaint in their entirety with prejudice and deny Sun any relief whatsoever;

2.      Enter judgment declaring that Versata is not and has not willfully or otherwise infringed, contributed to the infringement of, or induced the infringement of any claim of United States Patent Nos. 6,832,223; 5,870,719; 5,963,950; and 5,761,662;

3.      Enter judgment declaring all claims of United States Patent Nos. 6,832,223; 5,870,719; 5,963,950; and 5,761,662 invalid;

4.      Enter judgment declaring all claims of United States Patent Nos. 6,832,223; 5,870,719; 5,963,950; and 5,761,662 unenforceable;

5.      Permanently enjoin Sun from enforcing, attempting to enforce, or threatening to enforce against Versata , or any customer or potential customer of Versata, any claim of United States Patent Nos. 6,832,223; 5,870,719; 5,963,950; and 5,761,662;

6.      Enter judgment declaring this case to be an exceptional case within the meaning of U.S.C. § 285 and the charges of infringement herein to have been made in bad faith and award to Versata its reasonable attorneys' fees and expenses for defending this suit;

7.      Enter judgment declaring that Sun has attempted to monopolize the relevant product and geographic markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

8.      Permanently enjoin Sun from monopolizing or attempting to monopolize the relevant product and geographic markets.

9.      Award Versata restitution for any amounts that Sun received from Versata, or received at Versata's expense or detriment, as a result of Sun's wrongful conduct;

10.     Award Versata compensatory damages (general, special, and nominal), including investigation costs and legal fees and costs, trebled as provided by law;

11.     Award Versata punitive damages;

12.     Award Versata its costs and reasonable expenses and attorneys' fees in connection with this action; and

13.     Award Versata such other and further relief, in law or in equity, as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Versata demands a trial by jury as to all claims, defenses, and counterclaims so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld (#1014)*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market St.
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com

OF COUNSEL:                           *Attorneys for Defendants*
Peter J. Ayers
James N. Willi
John B. Campbell
MCKOOL SMITH, P.C.
300 W. 6th St., Ste. 1700
Austin, TX 78701-3941
(512) 692-8700
payers@mckoolsmith.com
jwilli@mckoolsmith.com
jcampbell@mckoolsmith.com

Dated:  January 25, 2008
1425989

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned, hereby certify that on January 25, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Paul J. Lockwood
Michael A. Barlow

I also certify that copies were caused to be served on January 25, 2008 upon the following in the manner indicated:

<table>
<tr><td>**<u>BY HAND AND EMAIL</u>**</td><td>**<u>BY EMAIL</u>**</td></tr>
<tr><td>Paul J. Lockwood<br>Michael A. Barlow<br>Skadden, Arps, Slate,<br> Meagher & Flom LLP<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, DE  19899</td><td>Jeffrey G. Randall<br>David W. Hansen<br>Skadden, Arps, Slate,<br> Meagher & Flom LLP<br>525 Universtiy Ave., Ste. 1100<br>Palo Alto, CA  94301</td></tr>
</table>

*/s/ Jack B. Blumenfeld (#1014)*
Jack B. Blumenfeld (#1014)
jblumenfeld@mnat.com